## AFFIDAVIT IN SUPPORT OF A CRIMINAL COMPLAINT

I, Rachel F. Otto, being duly sworn, hereby depose and states as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.      I have been employed by the Federal Bureau of Investigation ("FBI") as a Special Agent since January 2011 and am currently assigned to FBI Headquarters Cyber Division.  I was assigned to the Washington Field Office from August 2013 through September 2020, on an extraterritorial investigations squad responsible for international terrorism investigations emanating from East Europe, Central and South Asia, and North Africa.  I am responsible for investigating violations of the laws of the United States, including the investigation of terrorist groups or incidents targeting United States persons, both domestically and internationally. Throughout my career with the FBI, I have participated in investigations of organizations and individuals engaged in terrorism and terrorist activities. I completed a basic training program at the FBI academy in Quantico, Virginia.  This course provided me with training in investigations of federal criminal offenses, acts of terrorism, interviews, interrogations, tactical operations, and firearms.

2.      This affidavit is submitted in support of a criminal complaint alleging that Abu Agila Mohammad Mas'ud Kheir Al-Marimi, a/k/a Abu Agila Muhammad Mas'ud Kheir Al-Marimi, a/k/a, "Abu Agila Muhammad Mas'ud Kheir," a/k/a "Hasan Abu Ojalya Ibrahim" ("MASUD"),  committed violations of 18 U.S.C. §§ 32(a)(1) & (a)(2) and 844(i), in connection with the bombing of Pan American World Airways ("Pan Am") Flight 103, which occurred over the town of Lockerbie, Scotland, on December 21, 1988.

3.     This affidavit is based on my personal knowledge, information provided to me by other law enforcement agents and officers, law enforcement records, the factual findings made by the trial court at Camp Zeist, witness interviews, and my training and experience.

4.     Because this affidavit is being submitted for the limited purpose of establishing probable cause in support of a criminal complaint, I have not included each and every fact known to me concerning this investigation.  I have set forth only the facts that I believe are necessary to establish probable cause that MASUD violated 18 U.S.C. §§ 32(a)(1) & (a)(2) and 844(i).

### FACTUAL OVERVIEW

5.     Pan Am Flight 103 exploded into pieces almost instantaneously when a bomb exploded in the forward cargo area of the aircraft as it traveled over Lockerbie, Scotland, at 7:03 p.m. local time on December 21, 1988, at an altitude of 31,000 feet after 38 minutes of flight. The plane had taken off from London-Heathrow and was *en route* to John F. Kennedy Airport in New York.  Of the 270 individuals killed, 259 were passengers and crew, including 190 American citizens.  Eleven residents of Lockerbie were killed on the ground as a result of the bombing.  The crime scene stretched for over 840 square miles, nearly the width of Scotland.

6.     Immediately following the bombing, law enforcement officers from the Dumfries and Galloway Constabulary in Scotland, and personnel from various other Scottish law enforcement agencies, along with FBI agents from the United States, undertook an extensive joint investigation into the bombing that continues to this day.

7.     That joint investigation led to criminal charges, filed in November 1991 in both countries, charging two Libyan intelligence agents with their roles in the bombing.  Those charges were returned against Abdel Baset Ali al-Megrahi ("Megrahi") and Lamen Khalifa

Fhimah ("Fhimah").  The original investigation also uncovered the suspected involvement of a co-conspirator by the name of "Abu Agela Masud," but investigators were unable to identify that person.  A trial commenced in May 2000, before a specially established Scottish trial court at Camp Zeist in The Netherlands, consisting of three judges (but no jury).  In January 2001, Megrahi was convicted on all charges, and Fhimah was acquitted.

8.      The joint U.S.-Scottish investigation continued after the trial, including after the fall of the regime of former Libyan leader Muammar Qadaffi ("Qaddafi"), in or around 2011. During the course of that investigation, in approximately 2017, the FBI received a copy of an interview conducted by a Libyan law enforcement officer of MASUD while he was in Libyan custody.

9.      Since learning about the existence of MASUD's interview, U.S. and Scottish joint-investigative teams repeatedly endeavored to obtain more specific information concerning that interview.  After numerous attempts to learn more from the Government of Libya concerning MASUD's statement, your affiant was able to learn, in March 2020, that the interview of MASUD actually took place on September 12, 2012.  I have reviewed a copy of that interview, which was provided by Libya in Arabic and subsequently translated to English.  I am aware that also in March 2020, FBI agents and officials from Police Scotland interviewed the Libyan law enforcement officer who obtained the statement from MASUD.   This law enforcement officer expressed a willingness to testify at a trial if the Libyan Government agrees to make the officer available.

10.     According to that translation, in the September 12, 2012 interview, MASUD admitted to building the bomb that brought down Pan Am Flight 103 and to working with Megrahi and Fhimah to execute the plot.  He also admitted his involvement in other plots against

citizens of the United States and other western countries.  Additionally, MASUD confirmed that

the bombing operation of Pan Am Flight 103 was ordered by Libyan intelligence leadership.

MASUD confirmed that after the operation, Qadaffi thanked him and other members of the team

for their successful attack on the United States.

11.     I have also determined, from my review of other evidence, and speaking with

other investigators from Scotland and the FBI, that MASUD's confession is corroborated, as laid

out in greater detail below, by evidence gathered by Scottish and American investigators in the

years following the bombing, as well as evidence gathered and provided by other countries.

## STATUTORY BACKGROUND

12.      In 1988, 18 U.S.C. § 32(a)(1) criminalized the willful destruction of "any aircraft

in the special aircraft jurisdiction of the United States or any civil aircraft used, operated, or

employed in interstate, overseas, or foreign air commerce."  Subsection (a)(2) prohibited the

willful placement of a destructive device on an aircraft in the special aircraft jurisdiction of the

United States or on a civil aircraft used, operated, or employed in the interstate, overseas, or

foreign air commerce, if the placement of the destructive device is likely to endanger the safety

of the aircraft.

13.     A "civil aircraft" was defined in 1988 as "any aircraft other than a public

aircraft."  49 U.S.C. § 1301(17) (1988) (codified at 49 U.S.C. § 40102(16) today).  A "public

aircraft" was defined as "an aircraft used exclusively in the service of any government or

political subdivision thereof . . . but not including any government aircraft engaged in carrying

persons or property for commercial purposes."  49 U.S.C. § 1301(36) (1988) (modified and

codified at § 40102(41) today).  The "special aircraft jurisdiction of the United States was

defined to include "civil aircraft of the United States."  49 U.S.C. § 1301(38) (1988) (codified at § 46501(2) today).

14.     In 1988, 18 U.S.C. § 844(i) prohibited, among other things, destruction of a vehicle or personal property used in interstate or foreign commerce or in any activity affecting interstate or foreign commerce by means of an explosive.

15.     "Interstate or foreign commerce" was defined as "commerce between any place in a State and any place outside of that State, or within any possession of the United States (not including the Canal Zone) or the District of Columbia, and commerce between places within the same State but through any place outside of that State. 'State' includes the District of Columbia, the Commonwealth of Puerto Rico, and the possessions of the United States (not including the Canal Zone)."  18 U.S.C. § 841(b).

## BACKGROUND ABOUT THE EXTERNAL SECURITY ORGANIZATION

16.     In December 1988, the Socialist People's Libyan Jamahirya ("Libya") was a nation located on the Mediterranean coast of North Africa.  It was led by Muamar Qaddafi between in or around 1969 and 2011.

17.     The Jamahirya Security Organization, which was sometimes referred to as the External Security Organization ("JSO" or "ESO") was the Libyan intelligence service through which Libya conducted acts of terrorism against other nations and repressed the activities of Libyan dissidents abroad.  From 1979 to 2006, Libya was designated by the United States Department of State as a state sponsor of terrorism.

18.     MASUD is a citizen of Libya.  He worked in various capacities for the ESO, including as a "technical expert" in building explosive devices from in or around 1973 to in or

around 2011.  MASUD earned promotions to the rank of Colonel during his tenure within the ESO and participated in a number of operations on its behalf outside Libya.

19.     Fhimah is a citizen of Libya, and according to the 1991 indictment still pending in the United States District Court for the District of Columbia, he was utilized by the ESO in various cover positions, including at various times as the Station Manager for Libyan Arab Airways at Luqa Airport in the Republic of Malta.

20.     Megrahi was a citizen of Libya and, according to the 1991 indictment,[1] was used in various cover positions by the ESO as well, including serving as Chief of the Airline Security Section, Operations Division, and as such was familiar with airline security procedures.

## SPECIFIC FACTS ESTABLISHING PROBABLE CAUSE

21.     According to information on file with the Federal Aviation Authority ("FAA"), as of December 21, 1988, Pan Am was an airline owned by a corporation created under the laws of a state of the United States and registered under Chapter 20, Title 49 of the United States Code. Pan American World Airways flew its aircraft in commerce between the United States and other countries and operated aircraft leased from and owned by a corporation created under the laws of the State of New York.

22.     A Pan Am aircraft bearing tail number N739PA was a civil aircraft of the United States registered with the FAA.  On December 21, 1988, according to records provided by Pan Am and other documentary evidence, the Pan Am aircraft bearing number N739PA was operating in foreign air commerce between London's Heathrow Airport in the United Kingdom and John F. Kennedy Airport in the United States of America.

---

[1]     The indictment remains pending, with an active arrest warrant for Fhimah.  The prosecution of Megrahi was abated in 2015 following his death.

## *THE EXPLOSION AND EARLY RESPONSE*

23.     According to air-traffic control reports from the United Kingdom, including reports from England and Scotland, Pan Am Flight 103 took off from Heathrow Airport on December 21, 1988, and it continued in seemingly normal flight until approximately 7:03 p.m., local time, when it was in airspace near the town of Lockerbie, Scotland.  At that point, the aircraft abruptly disappeared from the radar screens of air-traffic controllers tracking the flight.

24.     According to numerous witnesses who were in Lockerbie and the surrounding areas on December 21, 1988, shortly after 7:03 p.m., portions of the aircraft began to fall from the sky, some of which appeared to be engulfed in flames.  As pieces of the aircraft hit the ground, some exploded.  One such incident created an explosion that witnesses likened to a "mushroom cloud," and left a crater approximately 40 feet deep where, moments before, residential homes had stood in the town of Lockerbie.

25.     Shortly after the plane fell to the ground, scores of Scottish police officers and first responders responded to Lockerbie and began the process of combing through the wreckage to attempt to look for survivors, locate personal effects of the victims, and collect evidence to allow investigators to determine the cause of the crash.  The trail of debris left by the wreckage of Pan Am Flight 103 covered approximately 840 square miles, and it included human remains of the victims and their personal effects, as well as pieces of the airplane and its contents.  I know from my review of, *inter alia*, crime scene photographs, reports written during the course of the initial investigation, as well as multiple conversations with other law-enforcement officers, that those approximately 840 square miles were searched by law enforcement personnel from Scotland and England on foot, as well as by other means, such as canvassing by aircraft, and that

the evidence recovered ranged in size from debris smaller than a fingernail, to pieces of aircraft

fuselage that needed to be moved by crane.

26.     A review of Pan Am records, in conjunction with the results of the effort to

recover human remains and personal effects described above, established that 259 people were

killed on board the aircraft, including 190 American citizens.  The victims also included citizens

of the United Kingdom, Argentina, Belgium, Bolivia, Canada, France, Germany, Hungary, India,

Ireland, Israel, Italy, Jamaica, Japan, Philippines, South Africa, Spain, Sweden, Switzerland, and

Trinidad and Tobago.  This number includes ten individuals whose remains were never found or

never identified.  The investigation also established that eleven residents of the town of

Lockerbie were killed as a result of Pan Am Flight 103 falling to the ground and the resulting

explosions.  Of those eleven, the remains of seven were never found.  A list of all 270 people

killed is below:

> John Michael Ahern
> Sarah Margaret Aicher
> John David Akerstrom
> Paula Marie Alderman (Bouckley)
> Ronald Ely Alexander
> Thomas Joseph Ammerman
> Martin Lewis Apfelbaum
> Rachel Maria Asrelsky
> Judith Ellen Atkinson (Bernstein)
> William Garretson Atkinson III
> Elisabeth Nichole Avoyne
> Jerry Don Avritt
> Clare Louise Bacciochi
> Harry Michael Bainbridge
> Stuart Murray Barclay
> Jean Mary Bell
> Julian MacBain Benello
> Lawrence Ray Bennett
> Philip Vernon Bergstrom
> Alistair Berkley
> Michael Stuart Bernstein
> Steven Russell Berrell

Noelle Lydie Berti Campbell

Surinder Mohan Bhatia
Kenneth John Bissett
Stephen John Boland
Glenn Bouckley
Nicole Elise Boulanger
Francis Boyer
Nicholas Bright
Daniel Solomon Browner (Bier)
Colleen Renee Brunner
Timothy Guy Burman
Michael Warren Buser
Warren Max Buser
Steven Lee Butler
William Martin Cadman
Fabiana Caffarone
Hernan Caffarone
Valerie Canady
Gregory Joseph Capasso
Timothy Michael Cardwell
Bernt Wilmar Carlsson
Richard Anthony Cawley
Frank Ciulla
Theodora Eugenia Cohen
Eric Michael Coker
Jason Michael Coker
Gary Leonard Colasanti
Bridget Concannon
Thomas Concannon
Sean Concannon
Tracey Jane Corner
Scott Marsh Cory
Willis Larry Coursey
Patricia Mary Coyle
John Binning Cummock
Joseph Patrick Curry
William Alan Daniels
Gretchen Joyce Dater
Shannon Davis
Gabriele Della Ripa
Joyce Christine DiMauro
Gianfranca Di Nardo
Peter Thomas Stanley Dix
Om Dikshit
Shanti Dixit

David Scott Dornstein
Michael Edward Doyle
Edgar Howard Eggleston III
Siv Ulla Engstrom
Turhan Michael Ergin
Charles Thomas Fisher IV
Joanne Flannigan
Kathleen Mary Flannigan
Thomas Brown Flannigan
Clayton Lee Flick
John Patrick Flynn
Arthur Jay Fondiler
Robert Gerard Fortune
Stacie Denise Franklin
Paul Stephen Mathew Freeman
James Ralph Fuller
Dyane Fuller (Boatman)
Ibolya Robertine Gabor
Amy Beth Gallagher
Matthew Kevin Gannon
Kenneth Raymond Garczynski
Paul Isaac Garrett
Kenneth James Gibson
William David Giebler, Jr.
Olive Leonora Gordon
Linda Susan Gordon
Anne Madalene Gorgacz
Loretta Anne Gorgacz
David J. Gould
Andre Nicholas Guevorgoian
Nicola Jane Hall
Lorraine Frances Halsch (Buser)
Lynne Carol Hartunian
Anthony Lacey Hawkins
Dora Henrietta Henry
Maurice Peter Henry
Pamela Elaine Herbert
Rodney Peter Hilbert
Alfred Hill
Katharine Augusta Hollister
Sophie Ailette Miriam Hudson
Josephine Hudson
Melina K. Hudson
Karen Lee Hunt
Roger Elwood Hurst
Elizabeth Sophie Ivell

Khaled Nazir Jaafar
Robert Van Houten Jeck
Paul Avron Jeffreys
Rachel Jeffreys
Kathleen Mary Jermyn
Beth Ann Johnson
Mary Lincoln Johnson
Timothy Baron Johnson
Christopher Andrew Jones
Julianne Frances Kelly
Jay Joseph Kingham
Patricia Ann Klein
Gregory Kosmowski
Elke Etha Kuehne
Minas Christopher Kulukundis
Mary Lancaster
Ronald Albert Lariviere
Maria Nieves Larracoechea
Robert Milton Leckburg, Jr.
William Chase Leyrer, Jr.
Joan Sherree Lichtenstein (Sheanshang)
Wendy Anne Lincoln
Alexander Lowenstein
Lloyd David Ludlow
Maria Theresia Lurbke
Lilibeth Tobilla Macalolooy
William Edward Mack
James Bruce MacQuarrie
Douglas Eugene Malicote
Wendy Gay Malicote (Forsythe)
Elizabeth Lillian Marek
Louis Anthony Marengo
Noel George Martin
Diane Marie Maslowski
William John McAllister
Daniel Emmet McCarthy
Robert Eugene McCollum
Charles Dennis McKee
Bernard Joseph McLaughlin
Jane Susan Melber
John Merrill
Suzanne Marie Miazga
Joseph Kenneth Miller
Jewel Courtney Mitchell
Richard Paul Monetti
Jane Ann Morgan

Eva Ingeborg Morson
Helga Rachael Mosey
Ingrid Elisabeth Mulroy
John Mulroy
Sean Kevin Mulroy
Mary Geraldine Murphy
Jean Aitken Murray
Karen Elizabeth Noonan
Daniel Emmett O'Connor
Mary Denice O'Neill
Anne Lindsey Otenasek
Bryony Elise Owen
Gwyneth Yvonne Margaret Owen
Laura Abigail Owens
Martha Ives Owens
Robert Plack Owens
Sarah Rebecca Owens
Robert Italo Pagnucco
Christos Papadopoulos
Peter Raymond Peirce
Michael Cosimo Pescatore
Sarah S B Philipps
Frederick Sandford Phillips
James Andrew Campbell Pitt
David Patrick Joseph Platt
Walter Leonard Porter
Pamela Lynn Posen
William Pugh, Jr.
Estrella Crisostomo Quiguyan
Rajesh Tarsis Priskel Ramses
Anmol Rattan
Garima D. Rattan
Suruchi Rattan
Anita Lynn Reeves
Mark Alan Rein
Jocelyn Reina
Diane Marie Rencevicz
Louise Ann Rogers
Edina Roller
Janos Gabor Roller
Zsuzsana Roller
Hanne Maria Root
Saul Mark Rosen
Andrea Victoria Rosenthal
Daniel Peter Rosenthal
Myra Josephine Royal

Arnaud David Rubin
Elyse Jeanne Saraceni
Theresa Elizabeth Saunders
Scott Christopher Saunders
Johannes Otto Schauble
Robert Thomas Schlageter
Thomas Britton Schultz
Sally Elizabeth Scott
Amy Elizabeth Shapiro
Mridula Shastri
Irving Stanley Sigal
Martin Bernard Carruthers Simpson
Irja Synnove Skabo
Ingrid Anita Smith
Cynthia Joan Smith
James Alvin Smith
Mary Edna Smith
John Somerville
Lynsey Anne Somerville
Paul Somerville
Rosaleen Later Somerville
Geraldine Anne Stevenson
Hannah Louise Stevenson
Rachael Stevenson
John Charles Stevenson
Charlotte Ann Stinnett
Michael Gary Stinnett
Stacey Leann Stinnett
James Ralph Stow
Elia G. Stratis
Anthony Selwyn Swan
Flora Margaret Swire
Marc Alex Tager
Hidekazu Tanaka
Andrew Alexander Teran
Arva Anthony Thomas
Jonathan Ryan Thomas
Lawanda Thomas
Mark Lawrence Tobin
David William Trimmer-Smith
Alexia Kathryn Tsairis
Barry Joseph Valentino
Tomas Floro van Tienhoven
Asaad Eidi Vejdany
Milutin Velimirovich
Nicholas Andreas Vrenios

Peter Petrisor Vulcu
Raymond Ronald Wagner
Janina Jozefa Waido
Thomas Edwin Walker
Kesha Weedon
Jerome Lee Weston
Jonathan White
Brittany Leigh Williams
Eric Jon Williams
George Waterson Williams
Stephanie Leigh Williams
Bonnie Leigh Williams
Miriam Luby Wolfe
Chelsea Marie Woods
Joe Nathan Woods
Dedera Lynn Woods (Copeland)
Joe Nathan Woods Jr.
Andrew Christopher Gillies Wright
Mark James Zwynenburg

27.     Many of the pieces of aircraft and other debris collected from the crime scene were sent to a forensic laboratory at the Royal Armament Research and Development Establishment ("RARDE"), at Fort Halstead, England, for analysis.  That analysis included a three-dimensional reconstruction of Pan Am Flight 103 from the recovered wreckage, including the position of baggage containers within the cargo hold, the suitcase believed to contain the bomb that brought down the aircraft, and that suitcase's likely position within the baggage container.   According to records from the original investigation, some of that report's relevant findings are summarized below:

a.  Pan Am Flight 103 was brought down in a matter of seconds by the detonation of a powerful explosive in the forward cargo hold of the aircraft, which occurred within a baggage container labeled "AVE 4041PA;"

b.  There were traces of the chemicals pentaerythritol tetranitrate  (PETN) and cyclotrimethylene trinitramine  (RDX), used in the manufacture of plastic explosives,

14

including Semtex, present on two sections of AVE 4041PA.  Follow-on investigation

confirmed this as the primary charge used in the improvised explosive device

("IED");

c.   The explosive was determined to have originated within a hard-shell "Samsonite"

brand suitcase from the "Silhouette 4000" range (the "IED suitcase");

d.   Investigative and forensic findings indicated that the suitcase containing the explosive

was likely not in contact with the floor of the baggage container and was likely

located in the second layer of luggage in the container. There were at least 13

personal items, which included 12 pieces of clothing and an umbrella that, with "high

probability," were in the IED suitcase that housed the explosive device at the moment

of detonation;

e.   The explosive charge was secreted within a Toshiba RT-SF 16 radio-cassette recorder

possessing a black plastic casing; and

f.   The mechanism by which the explosive device was detonated included a long-delay

electronic timer, type "MST-13," manufactured by the Swiss firm of Meister et

Bollier ("MEBO").

### *TRACING THE IED SUITCASE TO MALTA*

28.     Of the 13 personal items identified by investigators at RARDE as having a high

probability of originating within the IED suitcase, several were identified as coming from a

particular brand (*e.g.*, "Yorkie" trousers or "Slalom" shirt).  Many of the brands identified were

known to be either manufactured or sold in the Republic of Malta.  Three items were so

fragmented that no brand could be identified, and the thirteenth item was the umbrella.

29.     After RARDE had identified the 13 personal items, investigators traveled to Malta.  One of the 13 items was a pair of "Yorkie" branded trousers, with the number "1705" stamped on them.  When investigators visited Yorkie's manufacturing facility, they learned that the "1705" was a unique order number.  According to information provided by Yorkie, order number "1705" was delivered to the proprietors of a store named "Mary's House," located in Sliema, Malta, on or about November 18, 1988.

30.     Further investigation at Mary's House led investigators to recover control samples of the Yorkie trousers, as well as some of the personal items identified as likely originating in the IED suitcase.  Control samples from Mary's House and elsewhere in Malta were compared to evidence recovered from the crime scene.  Forensic examiners concluded that multiple control samples were identical in all material respects to the items of evidence determined to have originated from within the IED suitcase.

31.     Investigators also tried to re-create the path of the IED suitcase from where it entered the airline baggage system to when it was placed on board Pan Am Flight 103 at Heathrow Airport.  That investigation concluded that the IED suitcase was initially placed aboard an Air Malta flight, which originated at Luqa Airport in Malta on the morning of December 21, 1988.  The IED suitcase flew, unaccompanied, from Malta to Frankfurt, West Germany, where it was transferred onto Pan Am Flight 103A, a feeder flight for Pan Am Flight 103.  The suitcase then flew unaccompanied from Pan Am 103A to Heathrow Airport, where it was transferred onto Pan Am Flight 103.  Some of the key relevant facts developed during the investigation that support that conclusion are summarized below.

a.  At Heathrow Airport, Luggage Container AVE 4041PA, which investigators later determined contained the IED suitcase, was first loaded with one layer of luggage at a

facility that processed interline bags, that is, those bags being transferred from one airline to another.

b.  After AVE 4041PA was loaded at that facility, it was moved to Pan Am Flight 103, where it was filled with luggage being transferred from Pan Am Flight 103A. According to my review of records from the original investigation, AVE 4041PA was then loaded into the cargo hold of Pan Am Flight 103 at the location within the cargo hold later determined to be where the explosion occurred.

c.  At Frankfurt Airport, with certain exceptions for items like "rush" baggage, luggage was transferred between flights via a computerized baggage system.  According to records provided by the airport and/or its employees, as well as interviews conducted during the original investigation, Air Malta Flight 180 ("KM-180") arrived at Frankfurt airport in Germany from Luqa Airport in Malta at 12:48 p.m. local time on December 21, 1988.  Luggage from that flight was processed into the computerized baggage routing system at a station known as "V-3, 206," between approximately 1:04 p.m. and 1:10 or 1:16 p.m.[2]  KM-180 was the only flight whose bags were processed at V-3, 206 during that time frame.

d.  At approximately 1:07 p.m., an item coded at station V-3, 206 was transferred and delivered to the appropriate gate to be loaded on board Pan Am Flight 103A.

e.  Based on records from the initial investigation, no passenger had a ticket on KM-180, from Malta, with an onward booking to either London or the United States.

---

[2]        In 1988, there was a known issue with the computer clock that caused it to diverge from the actual time by as much as a few minutes per day.

f.  Documents provided to investigators established that all passengers who were recorded as having checked bags on Flight KM-180 retrieved their luggage at their final destination.

g.  Indeed, the records for Flight KM-180 show that 55 bags were checked, 55 bags were on the load plan, and all bags were retrieved at their final destination.  Officials in Malta have denied that an explosive could have been placed on board an aircraft in an unaccompanied bag at Luqa Airport.  The original investigation did not definitively establish how an unaccompanied bag was actually placed into the airline baggage stream at Luqa Airport, but based on the facts above, among others, it did establish that an unaccompanied bag was in fact placed into the airline baggage stream at Luqa Airport.

### LIBYAN INVOLVEMENT – MOVEMENTS OF MASUD, MEGRAHI, AND FHIMAH

32.  Investigators requested and received from the Government of Malta a number of embarkation and disembarkation immigration cards for the months surrounding December 1988. The cards were required to be filled out by, *inter alia*, passengers embarking or disembarking an international flight at Luqa Airport.  A review of those cards established the following relevant facts, among others:

a.  On or about December 7, 1988, MASUD and Megrahi traveled from Tripoli, Libya, to Malta on separate flights;

b.  On or about December 9, 1988, MASUD traveled from Malta to Tripoli;

c.  On or about December 9, 1988, Megrahi traveled from Malta to Zurich, Switzerland, and other records show that he continued on to Prague, Czechoslovakia;

d.  On or about December 14, 1988, MASUD traveled from Tripoli to Malta;

e.  On or about December 17, 1988, Megrahi returned to Malta from Zurich, and he continued on to Tripoli that same day; other records established that Megrahi had returned to Zurich from Prague on or about December 16, 1988;

f.  On or about December 18, 1988, Fhimah traveled from Malta to Tripoli;

g.  On or about December 20, 1988, Megrahi and Fhimah traveled from Tripoli to Malta on the same flight; and

h.  On or about December 21, 1988, Megrahi and MASUD traveled from Malta to Tripoli on the same flight.[3]

33.  According to airline records, Flight KM-180, which carried the IED suitcase from Malta to Frankfurt, opened for check-in at Luqa Airport at 8:15 a.m. local time on December 21, 1988, and closed at 9:15 a.m.  Libyan Arab Airways Flight LN-147, which transported Megrahi and MASUD back to Tripoli, opened for check-in at 8:50 a.m. on that same date and closed at 9:50 a.m.  There was thus an overlap of time during which both Flight KM-180 from Malta to Frankfurt, and Flight LN-147 from Malta to Tripoli were open for check-in.

34.  Investigators also recovered a diary from Fhimah's office in Malta.  His business partner confirmed for investigators that the diary belonged to Fhimah.  The diary was generally in Arabic, and a translation showed the entry for December 15, 1988, stated, "Abdel Baset [Megrahi] is coming from Zurich . . . take taggs [sic] from the Maltese Airlines[.]"  There was

---

[3]  On the December 20 and 21 flights, Megrahi traveled under an alias, "Ahmed Khalifah Abdusamad."  The investigation uncovered no evidence of Megrahi traveling under his true name to and from Malta on those dates. A handwriting analyst compared immigration cards in Megrahi's name with those in "Abdusamad's" name and determined that they were likely written by the same person.  Additionally, during the trial of Megrahi and Fhimah, the director of the Libyan General Passport and Nationality Department testified that in 1987, the ESO had requested a "coded" passport, *i.e.*, a passport that does not carry the name of its original holder, for Megrahi.  He also confirmed that the "coded" passport issued to Megrahi bore the name "Ahmed Khalifah Adbusamad."

another undated entry that read, "bring the tags from the airport (Abdel Baset, Abdul Salam)." As noted above, Megrahi in fact arrived in Malta from Zurich *en route* to Tripoli on December 17, and Fhimah joined him in Tripoli from Malta on December 18.  They both returned to Malta on December 20.  Based on your affiant's training and experience, I submit that there is probable cause to believe that, based on those diary entries, Fhimah was making notations indicating that he was to obtain the tags that would later be used to route the unaccompanied bag that was eventually loaded onto Pan Am Flight 103.

### *LIBYAN INVOLVEMENT – MST-13 TIMERS*

35.     During the search of the crime scene, police officers from Scotland recovered a piece of charred cloth that was sent to RARDE for analysis.  That analysis revealed that the piece of cloth was from a neckband of a gray shirt.  While the cloth lacked identifying features, it appeared similar in all material respects to the neckband of a "Slalom" branded shirt obtained by investigators as a control sample.  According to records from the original investigation, the damaged piece of neckband contained severe explosion damage with localized penetration holes and blackening consistent with explosive involvement. Embedded within it were nine pieces of black plastic, a small fragment of wire, a small fragment of metal, and a multi-layered fragment of white paper. All of these items were determined to be fragments from a Toshiba RT-SF 16 and its manual.  These and other factors caused forensic examiners to determine that, with a high degree of probability, this particular piece of cloth originated from within the IED suitcase. There was also, embedded within that piece of fabric, a green-colored circuit board that would eventually be labeled for identification purposes as "PT/35."

36.     Photographs of PT/35 were shown to the two principal owners and an employee of the aforementioned Swiss telecommunications firm MEBO.  The original investigation

concluded that a timer produced by MEBO detonated the explosive material that brought down

Pan Am Flight 103.  All three individuals from MEBO identified PT/35 as one of a series of

timers that the firm manufactured in the mid-1980s, known as "MST-13" timers.   According to

these interviews, MEBO produced between 20 and 30 MST-13 timers, with varying degrees of

sophistication, although the witnesses differed as to the exact permutations.[4]  The MEBO

technician who designed the MST-13 timers stated that PT/35 was contained in the early batch of

timers.  All of the MEBO witnesses agreed that MEBO did a lot of business with Libya, and one

of the MEBO witnesses confirmed that 20 MST-13 timers were sold to Libya (and, in this

witness' early statements, only to Libya), although in a later interview he claimed that up to

seven more were sold to East Germany.  This same witness also claimed that MST-13 timers

may have been part of a forgery produced by a company in Florida affiliated with the Central

Intelligence Agency.

### MASUD'S CONFESSION TO BOMBING PAN AM FLIGHT 103

37.     On or about September 12, 2012, while MASUD was in Libyan custody, he was

interviewed by a Libyan law-enforcement officer.  As noted above, the interview was transcribed

in Arabic and later translated into English by a translator based in the United Kingdom.  All

recitations of that statement in this affidavit come from the English translation of the interview.

As described in further detail below, during the course of the interview, MASUD admitted that

---

[4]     All three of these witnesses provided multiple statements to investigating law
enforcement officials, testified at the trial of Megrahi and Fhimah, and at least one has given
multiple media interviews.  The Scottish trial court stated in its official opinion, regarding the
MEBO witnesses, "All three . . . were shown to be unreliable witnesses.  Earlier statements
which they made to the police and judicial authorities were at times in conflict with each other,
and with evidence they gave in court."  In light of these conflicting statements, your affiant is
limiting her recitation of the evidence from these witnesses to broad references.

on orders of the ESO, and other high ranking ESO operatives, he built the bomb that brought down Pan Am Flight 103.

38.     According to the transcript and the interview of the officer who took MASUD's statement, the interview of MASUD was one of several conducted by Libyan law enforcement on September 12, 2012, during which open-ended questions were asked of MASUD.  The intent of the interviews, according to the officer, was to question MASUD and the others to determine whether they had committed any crimes against Libya and the Libyan people during the 2011 revolution in an attempt to keep Qadaffi in power.  Prior to the interview conducted with MASUD, the officer knew nothing about the Pan Am Flight 103 bombing, other than what the officer had read in the media.

39.     MASUD stated that he worked in the Technical Department of the ESO, which was a section that had several sub-sections.  During MASUD's time with the Technical Department, he handled Semtex explosives and built bombs on behalf of that department.

40.     When asked whether he had participated in any operations in Libya or outside of Libya, MASUD initiated a response that he had participated in the "Lockerbie airplane bombing," among others.  MASUD then continued explaining his involvement in narrative form.

41.     One of the other operations MASUD admitted to committing was the bombing of the LaBelle Discotheque, which took place in Berlin, West Germany, shortly after midnight on April 5, 1986.[5]  MASUD explained that he was asked by a Libyan intelligence official to travel to East Berlin to meet with the security officer at the Libyan embassy.  When MASUD met with this person at the embassy, he informed MASUD that MASUD was to build an explosive device

---

[5]     MASUD did not say the name of the nightclub, but he described it as a Berlin nightclub bombing taking place on April 4, 1986.

to be used against an American target.  MASUD prepared the explosive device from plastic explosive "dough," as well as a detonating fuse and a timing device that were present at the embassy.  MASUD then instructed the embassy official on how to set the timer.  He did not know who had actually placed the device at the nightclub.  MASUD said that the nightclub was chosen for attack because it was frequented by American military officers.  He recalled that four American officers died, and several were wounded.  Your affiant is aware, from his/her review of FBI documents relating to the LaBelle Discotheque attack, among other things, that two American service members and one Turkish woman were killed in the attack.  Scores more were injured, including some who were permanently disabled.

42.     Regarding the Pan Am Flight 103 bombing, MASUD stated that in the winter of 1988, he was summoned by a Libyan intelligence official to meet at that official's office in Tripoli, Libya.  While in that meeting, which involved additional Libyan intelligence officials, MASUD was asked whether the "suitcases" were finished.  When MASUD answered in the affirmative, one of the intelligence officials ordered MASUD to take one of the suitcases and travel with it to Malta.  MASUD said that the following day, he traveled to Malta by air, carrying the equipped suitcase.  Based on the context of this statement, as well as your affiant's training and experience, I submit that there is probable cause to believe MASUD was tasked to prepare a suitcase capable of carrying concealed explosives.

43.     MASUD recalled that one of the Libyan intelligence officials informed him that Megrahi and Fhimah would be there to meet him at the airport in Malta, and he stated that the pair did in fact meet him at the airport.  MASUD stated that he stayed at a hotel, pre-arranged for him by unknown individuals in Libya, which was located about 20 minutes from the airport.  He did not recall the name of that hotel.

44.     MASUD said that after approximately three or four days in the hotel, Megrahi and Fhimah met him in the lobby, and they told him to be up the following morning at 7:00 precisely. MASUD said that he was instructed to set the timer on the device in the suitcase so that the explosion would occur exactly eleven hours later.  Megrahi and Fhimah also handed MASUD $500 to purchase some clothes to put in the suitcase, instead of using his own clothes.[6]  MASUD stated that he did as instructed in the morning.  He also took a taxi to the airport in Malta, knowing that the aircraft on which the suitcase would be placed on board would be departing after MASUD handed the suitcase to Megrahi and Fhimah.  He described the suitcase as a medium-sized Samsonite suitcase that he used for traveling.

45.     MASUD told the Libyan officer that he stood at a specified place near the passenger luggage check at Luqa Airport.  He said that after some time passed, both Megrahi and Fhimah passed in front of him, and Fhimah went to the check-in desk near the luggage conveyor belt.  After Fhimah gave MASUD a sign with his head to bring over the suitcase, MASUD did so.  The suitcase was received by Fhimah, who placed it on the conveyor belt.  MASUD then

---

[6]     In the course of the original investigation, investigators interviewed the proprietor of Mary's House, who provided a description of a Libyan male who bought clothing consistent with many of the items of evidence that with "high probability" were inside the IED suitcase at the time of the explosion.  The indictment filed in this Court in 1991, charging Megrahi and Fhimah with their roles in the offense, alleges that as an overt act in support of the conspiracy, Megrahi purchased clothing at Mary's House on December 7, 1988.  The Scottish trial court also found that Megrahi made that purchase.  The conclusion that Megrahi purchased the clothing at Mary's House on December 7, 1988, is the subject of ongoing litigation in Scotland, where Megrahi's family is pursuing a posthumous appeal of his conviction.  The government still believes that this allegation is accurate.  Other clothing items that were determined by RARDE to have likely originated from within the IED suitcase probably did not originate from Mary's House.  For example, at least one item of clothing—a shoe—is unlikely to have originated from Mary's House based on the proprietor's statement that he never sold shoes at that store.  Based on this statement, and your affiant's review, *inter alia*, of the other evidence recounted above, it is your affiant's conclusion that it is possible that MASUD purchased or provided some of the items that were put into the IED suitcase, in addition to those that were purchased by Megrahi at Mary's House on December 7.

left.  He was given a boarding pass for a Libyan flight to Tripoli, which he stated was to take off at 9:00 a.m.

46.     MASUD later heard that an American plane was brought down by an explosion, and he was sure that the suitcase he had prepared earlier had been used in the operation. MASUD said that "unfortunately" the explosive device was not discovered by airport personnel despite the fact that he placed the suitcase on the scanner at the airport.  He explained that he hid the detonator and timer in a technical way that would make it difficult to be discovered, by placing it close to the metallic parts of the suitcase.  MASUD said that he used approximately one-and-a-half kilograms of plastic Semtex, and he added that plastic explosives do not show up on the airport baggage scanner.

47.     MASUD said that he was aware that Megrahi worked for the ESO and was responsible for the security of airplanes.  Fhimah, he became aware later, was part of the Libyan airline.[7]  MASUD explained his belief that Fhimah was able to receive the suitcase from MASUD and place it on the conveyor belt because Fhimah was an employee of the Libyan airline and was responsible for carrying out check-in procedures for that airline.  Additionally, check-in for a Libyan flight was open simultaneously.  Your affiant believes the implication of MASUD's statement is Fhimah would have been permitted behind the check-in counter at Luqa Airport.  MASUD stated that Fhimah put a tag belonging to an American airline on the suitcase, and thus when Fhimah placed it on the conveyor belt, the suitcase was tagged for the Pan American flight. Masud knew they would target Americans with the explosive device.

---

[7]     According to other evidence gathered in the case, your affiant has learned that Fhimah had previously been employed as the station manager for a Libyan airline at Luqa Airport, but he left that position at some point in 1988 prior to December.

48.     MASUD stated that three or four days after returning to Libya, he and Megrahi met with a senior Libyan intelligence official, who thanked them for a successful operation. Approximately three months after that, MASUD and Fhimah met with then-Libyan leader Muammar Qaddafi, and others, who thanked them for carrying out a great national duty against the Americans, and Qaddafi added that the operation was a total success.

### Conclusion

49.     For all of the reasons stated above, there is probable cause that MASUD conspired with Megrahi, Fhimah, and others, aided and abetted them, and was aided and abetted by them in causing the destruction of Pan Am Flight 103, on or about December 21, 1988, by causing a bomb to be placed onto that aircraft, and that in so doing, he caused the deaths of 270 persons, including 190 American citizens, in violation of 18 U.S.C. §§ 32(a)(1) & (a)(2) and 844(i).

50.     I declare under penalty of perjury that the information provided above in this affidavit is true and correct to the best of my knowledge.

Respectfully submitted,

RACHEL F. OTTO
Special Agent
Federal Bureau of Investigation

Subscribed and sworn pursuant to Fed. R. Crim. P. 4.1 on December 14, 2020.

_____

ZIA M. FARUQUI
UNITED STATES MAGISTRATE JUDGE

26